KENNEBEC COMPANY *vs.* AUGUSTA INSURANCE AND BANKING COMPANY.

One member of a partnership who are the agents of an insurance company has all the powers of the firm in making a parol contract of insurance.

An insurance company incorporated by the laws of another state may make a valid contract of insurance in this commonwealth.

An open policy of insurance " on property on board vessel or vessels, to, at and from all ports and places, as per indorsements to be made hereon," provided that it should not be binding until countersigned by the agents for the company at Boston, and was so countersigned. Said agents afterwards orally agreed with the assured to insure, under this

policy, for an additional premium, a certain number of bales of cotton (not particu larly described) on shore at New Orleans, "from date of storage until shipped." *Held*, that, in the absence of evidence of any limitation of the agents' authority, the oral agreement, though not indorsed on the policy, was binding on the insurers, if there was no unreasonable delay in shipping the cotton.

ACTION OF CONTRACT on a policy of insurance. Trial before *Merrick*, J., who took a verdict for the plaintiff, and reported the case to the whole court. All the facts necessary to the understanding of the points of law decided are stated in their opinion, drawn up by

MERRICK, J. This action is brought to recover the value of one hundred and sixty five bales of cotton, alleged to have been insured by the defendants against loss by fire, from the time of their deposit in a warehouse at New Orleans until they should be afterwards shipped on board some vessel or vessels bound thence to the port of Boston. The defendants are an insurance and banking company, incorporated under the laws of the State of Georgia, and having their principal place of business at Augusta in that state ; but they transacted business also in the city of Boston, where they admit that Page & Banks were their duly accredited and authorized agents. And it is now conceded by them, that the evidence adduced upon the trial sufficiently proved the issuing and delivery to the plaintiffs of the policy of insurance, bearing date the 9th of February 1855, as stated in the declaration. By this policy, they agree to insure " thirty thousand dollars on property on board vessel or vessels, to, at and from all ports or places, as per indorsements to be made hereon," against certain enumerated perils, and also against " all other losses and misfortunes to which insurers are liable by the rules and customs of insurance in Boston."

On the 21st of the same month of February, the plaintiffs, having purchased and become the owners of four hundred bales of cotton, of which one hundred and fifteen were on board the Brig Keying, and two hundred and eighty five in store at New Orleans, applied to the defendants' agents, Page & Banks, at Boston, to effect insurance thereon, under the open policy before mentioned. Banks, to whom the application was made, agreed

to effect the insurance upon both parcels on board vessel or vessels from New Orleans to Boston; taking also, in reference to the two hundred and eighty five bales, the additional "risk of fire on shore, until shipped, from date of storage;" charging therefor one eighth of one per cent. beyond the premium paid for the hazards of the voyage. And at the same time he made a memorandum to that effect on the book in which Page & Banks kept a record of policies issued in behalf and on account of the defendants. These facts were fully established by the evidence produced upon the trial, and are not now denied. In the course of the same day, but after the plaintiffs' agent, with whom the bargain had been made, had left, Banks, at the suggestion of his partner Page, but without the consent or knowledge of the plaintiffs, added to the memorandum on the policy record the words "thirty days;" intending thereby, as the defendants allege, to limit their responsibility in relation to the risk they had assumed of damage to the cotton by fire, to the term of thirty days from the time when it was put in store at New Orleans by the plaintiffs. Whatever may be considered to be the legal effect of the agreement to insure against loss by fire, it is obvious that the addition to the memorandum, made under such circumstances, constitutes no part of it, and can in no way qualify or control it. It was a material alteration of the terms of the bargain, and, having never been consented to by one of the parties, cannot be taken into consideration in determining their respective rights under it.

The defendants deny that they were bound by this contract, or that Page & Banks had any authority, as their agents, to make it, or to enter into any stipulations on their account to insure the plaintiffs against loss or damage by fire to their cotton, while in store at New Orleans. It was suggested at the argument, that, even if Page & Banks had any such authority, it was a power which could only be jointly executed by them; and therefore that, as Page assented to the agreement only as it was modified by the addition of the words "thirty days" to the memorandum, the risk of the defendants was necessarily limited to that period of time. But this position cannot be maintained

If Page & Banks were partners in business, as insurance brok·ers or otherwise, and the partnership were authorized to act as agents for the defendants, the authority thus conferred upon them might legally be executed by each of their members; and the act of one of the partners in this particular relation, like his acts concerning or in the management of the general business of the partnership, was in behalf of and with the powers of both, binding, in the latter case, both the members of the firm, and, in the former, the principal by whom their agency was created.

Giving this effect to the act of one of the partners, no doubt will remain, upon the evidence, that a contract to insure the property of the plaintiffs against the hazard of fire, while it remained in store at New Orleans, was made with them by Page & Banks, who professed to act in that transaction as the agents of the defendants. And this conclusion leads us directly to the consideration of the terms, character and effect of the contract, and of the alleged liability of the defendants under it.

The policy which was issued by the defendants was in its terms restricted to such property only as should be on board vessel or vessels bound on voyages from one port to another. It contains no stipulation to insure property of any description, while it remains on shore, or before it is waterborne. Unless therefore the express stipulations contained in the policy were in fact, and could lawfully be changed and enlarged by the subsequent agreement made by the plaintiffs with Page & Banks, as the agents of the defendants, the latter were and could be under no liability for the cotton destroyed by fire in the storehouse at New Orleans. But it is now a perfectly well settled doctrine that a written contract may be materially varied and changed by subsequent agreements, orally entered into by the parties at any time before there has been a breach of its stipulations. This is very fully and emphatically stated by Lord Denman in the case of *Goss* v. *Lord Nugent*, 5 B. & Ad. 65, and 2 Nev. & Man. 33, 34. He there says: "After the agreement has been reduced into writing, it is competent to the parties, at any time before breach of it, by a new contract not in

writing, either altogether to waive, dissolve or annul the former agreement, or in any manner to add to, or subtract from, or vary or qualify the terms of it, and thus to make a new contract, which is to be proved partly by the written agreement, and partly by the subsequent verbal terms engrafted upon what will be thus left of the written agreement." This principle of law, thus stated and explained by Lord Denman, has been distinctly sanctioned and adopted by this court. *Cummings* v. *Arnold,* 3 Met. 486. And Mr. Justice Wilde, in giving the opinion of the court in that case, refers to numerous authorities, which are considered by him as fully upholding and sustaining it. After his very full discussion of the subject, it is unnecessary for us here to reëxamine, or in any way to remark upon the various cases to which he refers.

It only remains therefore to consider and ascertain whether the defendants were themselves possessed of sufficient legal power to enter into such new stipulations, and whether Page & Banks, in making it, were their authorized agents to make such a contract. The contract was made, if at all, at Boston. The defendants were a foreign corporation, acting only under their charter, created by a statute of the State of Georgia. But it has heretofore, upon much consideration, been determined, and is now uniformly considered as having been conclusively determined, that corporations, legally established under the laws of one of the states of the United States, are legally competent to negotiate and enter into contracts beyond the jurisdiction of the State where they are created; and that they have the right to enjoy the benefit of all such contracts as they may enter into beyond the limits of such jurisdiction, and may be compelled to perform and fulfil all the obligations thereby imposed upon them. *Bank of Augusta* v. *Earle,* 13 Pet. 519. Angell & Ames on Corp. § 273.

The defendants therefore could lawfully not only issue, as they did, this policy of insurance to the plaintiffs at Boston, but could also at the same place, at any subsequent time before the breach of the promises contained in it, by a new and mutual agreement engrafted upon it, alter, vary, change or

enlarge their engagements and liabilities under it.   And what they could do by their own direct action, they could certainly do by constituting agents, with appropriate powers sufficiently broad and comprehensive to enable them to effect the object to be accomplished.   Indeed, corporations can only act, either at home or abroad, by duly constituted agents.   If then Page & Banks, when professing to act in their behalf and for them and on their account, were invested with sufficient authority therefor, and did make an agreement with the plaintiffs to insure their cotton against damage by fire, while in store at New Orleans, and until it should be shipped on board some vessel or vessels bound thence to Boston, that was a change and variation of the terms and stipulations of the written policy, which it was competent .or the parties to make.   And the defendants thereby became responsible for the due performance of all the provisions and stipulations of the new agreement.

It remains therefore to inquire whether Page & Banks were properly invested by the defendants with authority to act on their account, in thus varying and enlarging the terms of the written contract.   Undoubtedly the burden of proof is upon the plaintiffs to establish this fact, before they can insist that any new obligations, beyond those assumed in the policy they had issued, were contracted by the defendants.   In determining this question upon the evidence which was produced on the trial, and now stated in the report of the case, it is very apparent that there is no intrinsic improbability, arising from the pursuits in which they were engaged, or the purposes they desired to accomplish, that they would exercise all their power in conferring upon their agents all the authority which they possessed themselves in their character of insurers.   The language contained in the policy issued to the plaintiffs shows that, in constituting an agency in Boston, they were not unmindful of or inattentive to the calls which would be likely to be made upon them in the transaction of the business in which they proposed to engage there, and for a share in the advantages of which they intended to become competitors.   For by the terms of the written policy they expressly take upon themselves the perils of

18*

all "losses and misfortunes to which insurers are liable by the rules and customs of insurance in Boston." They did in fact establish an agency there. Of that no question is made. And to secure to themselves the profits and advantages which they hoped to derive from it, they would be very likely to use all the lawful means they could command to secure a larger participation in the business which they were thus seeking to prosecute. To this end they would naturally invest their agents with the most ample authority they could confer, and they would desire to have them prepared to meet all the various exigencies which could occur in the management of their affairs. And in looking at the positive evidence in the case, it is seen that they actually did what it was so natural and reasonable to suppose they would do. It appears quite certain, in the first place, that there had been such communications from the defendants to Page & Banks, that the latter, when applied to take the risk of fire upon the plaintiffs' cotton, while it was on storage at New Orleans, entertained no doubts of their right and authority to make such an engagement. The application of the plaintiffs to them was readily and unhesitatingly acceded to. And no objection appears to have occurred to either of the members of the firm, against their right to enter into new oral stipulations respecting the provisions in the policy. The contract was promptly made; the new and additional responsibility was assumed without the least hesitation. It is hardly possible that this should have been done, unless Page & Banks well knew that they had been clothed with ample authority to justify them in doing it. And the testimony of Banks, considering the circumstances under which it was taken, and his relation to the parties and the particular transaction in controversy, has a direct tendency to show that the authority derived from the defendants was amply sufficient to enable the agents to bind their principals by the contract entered into. Upon being inquired of, after he had already stated the fact that he made the new and additional contract, whereby the defendants were to assume the shore risk of fire, while the cotton was in store, he proceeded to testify, in general terms, that Page & Banks had a

right, and that he himself had a right to act as agent of the defendants. Though he does not assert, in direct terms, that he was particularly authorized to insure property on shore against the hazard of fire, yet he says nothing which in any degree limits or diminishes the force and comprehensive import of his general expressions concerning the extent of his agency. And as the questions proposed to him were in reference solely to the particular contract which he made with the plaintiffs concerning the insurance of their cotton against the risk of fire, while on shore and in the warehouse at New Orleans, his answers must be considered as having been given in reference to that single and particular subject of inquiry. Thus limited and applied, his reply to the interrogatory proposed to him, that he was the agent of the defendants, and effected the insurance upon the cotton of the plaintiffs against the hazard of fire while it was in store at New Orleans, is equivalent to a positive affirmation that he was invested with all needful authority to give legal validity to the contract which he assumed to make. Especially ought a conclusion to that effect to be deduced from his testimony, when it is considered not only that there was no evidence whatever, adduced upon the trial, having any tendency to show that his agency was of a more limited character; but no interrogatory even was proposed to him by the defendants upon his cross-examination, seeking for further or more particular information from him on the subject, or calculated to draw his attention to, and induce him to testify concerning any supposed limitation of his authority, which had been prescribed by the defendants. If any such limitation or restraint had so been imposed upon their agents, they surely would not have failed, when one of those agents was testifying upon the subject, to have caused it to be fully disclosed. They would at least have endeavored, upon such a favorable opportunity, to have drawn from the witness some account or explanation of the nature and extent of his authority, if there had been any reason why they should have considered him incapable of making the contract which he did make with the plaintiffs. Such a failure on their part may well be considered as strong confirmation of the proof derived from

the testimony of Banks, that he did not transcend the limits of the authority with which he had been invested, and therefore that the new contract which he made was obligatory upon the defendants.

There is no force in the suggestion, urged upon our attention by their counsel, to avert us from such a conclusion, that there is a provision in the written policy, " that it shall not be binding until countersigned by Messrs. Page & Banks, agents for said company at Boston." They were not indeed to issue a policy without countersigning it. But that was only a mode of authenticating and completing the execution of a particular contract, and the provision in relation to it can in no sense be regarded as a restriction upon their power in discharge of their duties as agents on other occasions, or in reference to other and different stipulations.

In the view we have taken of the character and effect of the contract between the parties, it is obvious that an indorsement upon the policy, of the property to be insured against the peril of fire while it was on shore, was not essential to subject the defendants to legal liability under the new or modified contract. Such omission therefore to indorse it until after the loss, though urged as an insuperable objection to the maintenance of this action, is immaterial. And it affords no reason why the plaintiffs should not recover the value of the insured property which was destroyed by fire.

It is unimportant in what manner, or by what terms, the property insured was described, or how it was so designated and made known that both parties equally well understood what it was which was intended to be insured. It is sufficient that the description was intelligible and satisfactory to both of them; and, in relation to this question, there is certainly, upon the evidence, no room for doubt. The two hundred and eighty five bales of cotton insured were those stored by the plaintiffs at New Orleans; there was no difficulty in identifying the property, and it has in fact been distinctly identified by the evidence produced upon the trial. It is useless to speculate upon what would have been the condition of the parties under different

circumstances. It is enough that the property insured existed, that it belonged to the plaintiffs; that it was made known to the defendants' agents by a description of it, perfectly intelligible and satisfactory to them at the time the insurance upon it was effected. The premium of insurance was mutually agreed upon; the place of the storage of the property was satisfactorily described; and its value only remained to be ascertained, when the bills of lading or the invoice should come to hand. That was a matter concerning which the parties were content that there should be a postponement to some later day; and the defendants cannot now avail themselves of a postponement, in respect to ascertaining the value of the property insured, to which they impliedly consented, as a valid objection to the maintenance of an action to recover its value.

Nor is there any sufficient foundation for the further objection of the defendants, that the agreement to insure fixes no certain time when the risk assumed by the defendants was either to commence or to be determined. The commencement of it was the day when the cotton was first put in store by the plaintiffs at New Orleans. The termination of the whole risk, which included both the hazard of fire on shore, and the perils of the sea on the voyage to be performed, was to be upon the safe arrival of the cotton in Boston, the place of its ultimate destination. Nor can it be said by the defendants, as any substantial ground of defence to this action, that there was any unreasonable delay on the part of the plaintiffs in shipping the cotton. Without expressing any opinion as to how long the plaintiffs might have had the benefit of insurance of their cotton on shore under the contract with the defendants, it is a sufficient reply to this objection, that no unreasonable delay on their part has been shown. The cotton was destroyed in nine days after the insurance was effected. The fire by which the one hundred and sixty five bales was destroyed occurred on the 2d of March, and the whole quantity of four hundred bales had been purchased by the plaintiffs some time after the 1st of January. We can perceive, in the facts stated, no evidence of any delay in forwarding any part of it from New Orleans, beyond what resulted

from unavoidable difficulty in finding vessels to take it on freight, or from the exercise of reasonable prudence in avoiding excessive charges for its transportation.

Upon a full review therefore of all the objections made by the defendants, of the facts disclosed and of the evidence produced at the trial and laid before the jury, as they are presented in the report of the case, we think it clearly appears that the jury were well warranted in finding a verdict for the plaintiffs; and that the evidence, as it is reported, is sufficient to maintain the action in their behalf.

*Judgment on the verdict for the plaintiffs.*

*C. B. Goodrich & E. F. Hodges*, for the defendants.